371 N.W.2d 358 (1985)
In the Matter of the Termination of Parental Rights Over A.M.L. and Concerning Her Father, G.G.L.
No. 14731.
Supreme Court of South Dakota.
Considered on Briefs May 22, 1985.
Decided July 17, 1985.
Rexford Hagg of Whiting, Hagg & Hagg, Rapid City, for appellee, A.M.L.
Steven D. Rich of Wilson, Olson, Goodsell & Nash, P.C., Rapid City, for appellant, G.G.L.
Janice C. Godtland, Asst. Atty. Gen., Pierre, for appellee State of S.D.; Mark V. Meierhenry, Atty. Gen., Pierre, on brief.
FOSHEIM, Chief Justice.
An order of adjudication found A.M.L., the daughter of G.G.L., to be a dependent and neglected child. This was followed by a decree of disposition in which parental rights of the father, G.G.L., were terminated. We affirm.
L.M.L., A.M.L.'s mother, commenced a divorce action against G.G.L. in February of 1983. The court then ordered G.G.L. to restrain from harassing or interfering with L.M.L. and H.T., A.M.L.'s grandmother. The showing in support of the restraining order alleged that G.G.L. experienced fits of rage and jealousy during which he became extremely violent. It was claimed that on one occasion G.G.L. choked and *359 struck L.M.L. while she was pregnant with A.M.L. and that he later pushed and shoved her while she was holding the then two month old baby. The showing indicated that G.G.L. suffered a head injury while in Viet Nam and was exposed to Agent Orange. He experienced memory lapses involving periods of rage and violence. He refused to secure help.
H.T. also deposed that G.G.L. had an unpredictable and violent temper. She stated that G.G.L. sometimes harassed L.M.L. while she was nursing the baby and that L.M.L. had called her several times to help her protect the baby for whose safety she feared.
On May 1, 1983, A.M.L., then four months old, was found in the home alone with the bodies of her mother and her grandmother. The two women had been murdered. A.M.L. was placed in the temporary custody of the Department of Social Services. G.G.L. was convicted of murdering his wife and her mother and was sentenced on June 4, 1984, to life in the penitentiary on each count. Appeals from both convictions are pending.
At the dependency and neglect hearing held on July 24, 1984, G.G.L. agreed that A.M.L. was a dependent and neglected child. He stated in open court that his parental rights should be terminated. He also said he wanted A.M.L. to be placed with his brother and his brother's wife for adoption. The court explained that his brother would be considered as an adoptive resource but that it was the province of the court to decide the most appropriate adoptive home for the child. The court explained that various homes would be studied, including that of his brother, to which G.G.L. stated he understood and agreed.
G.G.L. first argues that the court erred when it placed A.M.L. in the temporary custody of the Department of Social Services for two months before a petition was filed. It is settled law in this State that a temporary custody order no longer in effect is not subject to review. In re N.J.W., 273 N.W.2d 134, 137 (S.D.1978).
Appellant next claims that his consent to the termination of parental rights was not knowingly and voluntarily made. He argues that his consent was conditioned upon his brother and sister-in-law being allowed to adopt the child. It appears, however, from the transcript that appellant was fully and carefully informed that there was no guarantee that his brother would be allowed to adopt A.M.L. and that appellant understood this. He then indicated no misgivings about the termination.
The proceeding was commenced and processed under SDCL ch. 26-8 as an involuntary proceeding. Under this chapter the parent's consent is not needed to find the child dependent and neglected or to terminate parental rights. It is unlike the voluntary termination procedure found at SDCL ch. 25-5A, wherein a parent's voluntary consent is crucial. Appellant's consent was not the sole basis for the termination of his parental rights. The evidence clearly supports the findings of the court that his parental rights should be terminated under the involuntary procedure statute.
G.G.L. next contends findings IX and X of the lower court were not sustained by sufficient evidence. The test is whether the findings of the court were clearly erroneous. SDCL § 15-6-52(a). See In re N.J.W., 273 N.W.2d at 138. We find this claim to be without merit. The decision and order of the trial court are affirmed.
WOLLMAN and MORGAN, JJ., and WUEST, Circuit Court Judge Acting as a Supreme Court Justice, concur.
HENDERSON, J., concurs specially.
HENDERSON, Justice (specially concurring).
Counsel for the child by letter, and not by brief, takes the position that no appropriate position can be taken on behalf of the child until this Court renders a decision on the appeal of the father's murder conviction. This posits an overwhelming concern *360 for this author because the termination is based, inter alia, upon the father's murder conviction of the child's mother and grandmother. Where are we, mentally and legally, should this murder conviction be reversed? Have we been presumptive by affirming this termination at this time?
A divorce action was pending between the father and the deceased mother at the time of the two homicides. The trial court, in this termination proceeding, took into consideration the showing made in the divorce action to support that the father was a man of extreme violence and one who refused medical attention when it appeared obvious that he should have attention. Divorce File # D83-81 of Pennington County, South Dakota, is made a full part of this record.
If I had my legal druthers, I would prefer that this case be placed in suspense in our files until such time as a decision is rendered on the murder appeal. However, this action is before me and as a member of this Court, my duty is clear, if not commanded, to vote upon those matters which are of great import and grave concern, on a daily basis.[*]
As to the effect of incarceration, ipso facto, on termination of parental rights, there is a division of authority. Authorities supporting termination when the parent is incarcerated are: Matter of Adoption of Doe, 99 N.M. 278, 657 P.2d 134 (1982) (statute defining neglect as inability to discharge parental responsibilities because of incarceration); and Matter of A.M.K., 105 Wis.2d 91, 312 N.W.2d 840 (1981) (statute defining parental unfitness as confinement for a felony). Authorities taking a contrary view are: In Interest of Sanders, 77 Ill.App.3d 78, 32 Ill.Dec. 847, 395 N.E.2d 1228 (1979); Matter of Kidder, 61 Mich.App. 451, 233 N.W.2d 495 (1975); State v. Grady, 231 Or. 65, 371 P.2d 68 (1962). In 1982, the Supreme Court of Nebraska, in the case of In re Interest of Ditter, 212 Neb. 279, 284, 322 N.W.2d 642, 645 (1982), took what I consider to be an enlightened viewpoint of this general subject by stating: "Although a parent's parental rights should not be terminated for the sole reason of conviction of crime and incarceration, the fact of incarceration may be considered along with other factors in determining whether parental rights should be terminated." (Quoting In re Interest of Wagner and Russell, 209 Neb. 33, 36-37, 305 N.W.2d 900, 902 (1981)). It strikes me that imprisonment is one of the factors that should be taken into consideration in the termination of a parent's right to a child, but that a court cannot blindly terminate a parent's rights without looking at the other facts and circumstances which would include the general fitness of the parent and the length of period of incarceration. The Washington Court of Appeals put it this way: "Mere imprisonment of the father is not sufficient of itself for an order of deprivation, but it is not a factor to be ignored." In re Clark, 26 Wash.App. 832, 835, 611 P.2d 1343, 1345 (1980).
Here, I am influenced by the fact that there was a history of great violence by the father, a head injury which triggers mental lapses that go unattended, a statement in open court to the trial judge, and Dispositional Finding of Fact V, which states:
That the respondent herein, [G.G.L.], did admit in open court that termination of his parental rights with respect to [A.M.L.] is the least restrictive alternative with regard to the protection and upbringing of [A.M.L.], and in the service of the best interests of said minor child, said admissions having been made in the presence of his counsel.
Accordingly, I specially concur.
NOTES
[*] In his special writing in Stavig v. S.D. Highway Patrol, 371 N.W.2d 166, 170 (S.D.1985), Retired Justice Francis Dunn, a former Chief Justice of this Court, who personally observed the mushrooming growth of appeals in this Court, termed this Court "beleaguered." In a study of the appellate court systems in the United States, the Department of Justice analyzed growth of appeals for the various states. From 1973 to 1983, South Dakota ranked fourth in the highest increase per appellate caseload, per Justice, with a total increase during that period of time of 152%.